UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KELLY THOMPSON,

                                    Plaintiff

                                                            DECISION AND ORDER

-vs-
                                                            10-CV-6576 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                    Defendant.
_____

APPEARANCES

For the Plaintiff:          Peter A. Gorton, Esq.
                            Lachman & Gorton
                            1500 East Main Street
                            P.O. Box 89
                            Endicott, New York 13760

For the Defendant:          Kathryn L. Smith, A.U.S.A.
                            United States Attorney's Office
                            100 State Street
                            Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application of Kelly Thompson ("Plaintiff") for Social Security disability

benefits.  Now before the Court is Plaintiff's motion [#10] for judgment on the pleadings

and Defendant's cross-motion [#12] for judgment on the pleadings.

Plaintiff maintains that the Administrative Law Judge ("ALJ") failed to incorporate

certain factual findings into the residual functional capacity ("RFC") assessment.

1

Specifically, at step three of the five-step sequential analysis, the ALJ stated that Plaintiff was "moderately" limited with regard to concentration, persistence, and pace, but she did not include that limitation in the RFC assessment.  Plaintiff further argues that the ALJ failed to properly evaluate and weigh medical evidence concerning Plaintiff's nonexertional mental impairments.  Lastly, Plaintiff maintains that the ALJ failed to properly evaluate her credibility.  On this point, Plaintiff contends that the ALJ selectively went through the record and "cherry picked" information that was harmful to Plaintiff's claim, but failed to include any of the information that supported Plaintiff's claim.

Plaintiff's application [#10] is granted, and Defendant's cross-motion [#12] is denied.

## PROCEDURAL HISTORY

On October 12, 2010, Plaintiff commenced this action.  On August 26, 2011, Plaintiff filed the subject motion [#10] for judgment on the pleadings.  On September 15, 2011, Defendant filed the subject cross-motion [#12] for judgment on the pleadings.  On April 19, 2012, counsel for the parties appeared before the undersigned for oral argument.

## VOCATIONAL HISTORY

Plaintiff was age 26 at the time of the hearing. (27)[1].  Her level of education is unclear.  In that regard, at the hearing before the ALJ, Plaintiff indicated that she dropped out of high school after completing the eleventh grade. (27)  However,

---

[1]Unless otherwise noted, references are to the administrative record.

elsewhere in the record Plaintiff reportedly indicated that she "went to the 10th grade" (390), while at another point, she reportedly indicated that she completed the 12th grade but "could not pass her [New York State] Regent's exams." (314)  Plaintiff stated that she earned her GED (27), but needed someone to read the GED exam to her, because she does not remember what she reads, but does remember when someone else reads to her. (28)

On December 14, 2009, Plaintiff told the ALJ that since earning her GED, she had not taken any further "classes or courses" and had not earned any "certificates." (27)  However, in September 2009 she told her doctor that she was attending Corning Community College to become a counselor. (376)  She also previously told the Social Security Administration that she completed  training as a "certified nurse's assistant" in 2002. (139)

Plaintiff indicated that she has worked in the following jobs: "counter worker" in a pizza shop and fast food restaurant; dishwasher in an ice cream shop; hostess in a restaurant; nurse's aide in a nursing home; and home health aide. (135)  Her longest period of employment was approximately two years, working as a nurse's aide. *Id*.

In or about 2007, Plaintiff indicated that she stopped working because, "I always got fired due to my depression[.]  I didn't want to go to work.  . . .  I didn't feel like getting out of bed.  I was written up three times.  I argued with my boss.  I got fired." (134)  Plaintiff further stated:  "*If I don't have my medication* I get mad really easy, some days I am too depressed to get out of bed to go to work.  I feel like people are after me.  My mind wanders and I have racing thoughts so I can't concentrate on what I am supposed to be doing." (134) (emphasis added)  On another occasion, Plaintiff indicated, "It is

very hard to hold a job[.]  I get depressed and isolated and don't want to be around people." (152)   Plaintiff further stated: "[W]hen I get depressed all I want to do is sleep, and I can't function.  Like I don't want to leave my house.  I isolate, and I would call into work because I didn't want to leave my house." (31-32)  Plaintiff also indicated that she would react inappropriately to coworkers during "manic" episodes:  "I can't like listen to people.  I could be nice to you one minute and then the next minute I'll be mean." (31)

Plaintiff has a drug-related felony conviction. (108, 220, 222)

## ACTIVITIES OF DAILY LIVING

Plaintiff has no physical limitations, but maintains that her activities of daily living ("ADLs") are limited by her non-exertional impairments, especially depression.  In that regard, Plaintiff stated that she usually becomes depressed once per month, for about a week. (35-36)  Sometimes she only becomes depressed every two months. *Id*. Plaintiff indicated that when she is depressed, she wants to "isolate," that is, be alone, and sleep (31-32), and that she cannot concentrate. (35)  Plaintiff further stated that depression is her biggest obstacle to working, and that she has been fired from several jobs during episodes of depression. (32, 36)

Plaintiff also claimed to experience manic phases about every six months, usually lasting about three days. (30)  Plaintiff stated that during her manic episodes, she cannot listen to people, and, as indicated above, can be nice to people one minute and mean the next. (30-31)

Plaintiff indicated that she can perform ordinary childcare and household chores as long as she does not become depressed and feel the need to "isolate" herself. (*See, e.g.*, 32, 156)  Plaintiff's mother usually helps her take care of her children about five

4

days per week even when Plaintiff is feeling well, and helps more when Plaintiff feels depressed. (32-33; 214)  Plaintiff indicated that her mother usually does the shopping and laundry. (38-39)

At the hearing, Plaintiff claimed to have no friends, to go "nowhere," and to "just sit in the house," even when she is not feeling depressed. (33)  However, Plaintiff has a long-term boyfriend, who is the father of two of her children, although they are sometimes abusive toward each other. (222, 286)  Furthermore, upon her release from the hospital in July 2007, Plaintiff indicated that she had "social support" from "family, friends." (305) Plaintiff also reported that "she gets along well with friends and family." (317)  Moreover, on May 21, 2007, Plaintiff reported that some of her "friends" had used her prescription drugs while she was in jail on a parole violation. (220)  Additionally, Plaintiff reported that she has a supportive relationship with her "best friend's mother." (240)

## MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here in its entirety.  It is sufficient for purposes of this Decision and Order to note the following facts.

On January 8, 1997, when Plaintiff was in Eighth Grade, school documents indicate that she exhibited aggression, anxiety, depression, delinquency, "social problems," and inattention. (361)  Teachers observed that Plaintiff had a quick temper and could not calm herself down when she became angry. (364-365) When tested for intellectual ability, Plaintiff scored in the low average range.  (363)  Plaintiff performed well with regard to academic achievement and written language skills. (364)

On December 13, 1999, Plaintiff was seen by psychiatrist Kyung Chun, M.D. ("Chun"), of Family Services of Chemung County ("Family Services"). Chun conducted a psychiatric evaluation. (253-256).  Plaintiff was sixteen years old, had one child and was in a program for homeless adolescents.  Plaintiff indicated that her parents, who were separated, were neglectful and abusive.  Plaintiff was enrolled in a BOCES program for training as a dental assistant.  Plaintiff described being stressed from attempting to simultaneously care for her child by herself and pursue her education. Plaintiff indicated that she felt depressed, angry and irritable. (253)  She also reported having difficulty concentrating in her classes. *Id*.  Plaintiff claimed to have difficulty falling asleep, and to experience feelings of hopelessness and worthlessness. (254) Chun observed that Plaintiff exhibited average intellectual function, and that she was able to concentrate during the examination. (255)  Chun's diagnosis was depressive disorder not otherwise specified and post-traumatic stress disorder. *Id*.  Chun prescribed Prozac and counseling. *Id*.

On January 12, 2000, Chun examined Plaintiff, who was complaining of having difficulty concentrating at school. (251)  On February 11, 2000, Chun reported that Plaintiff was attending school and keeping her feelings under control. (252)  Chun prescribed Prozac, Trazodone and Klonopin. *Id*.   Plaintiff indicated that her depression was somewhat improved. *Id*.  On May 5, 2000, Chun reported that Plaintiff had been required to stop taking her usual medication in connection with surgery, and was experiencing mood swings. (250)  Plaintiff reported, though, that her anxiety was under control.  Chun prescribed Prozac and Trazodone, and recommended that Plaintiff come

for psychotherapy. (250)  On October 2, 2000, Plaintiff told Chun that she had run out

of medication, and was feeling depressed and unable to concentrate. (249)  Chun

prescribed Prozac and Trazodone, and recommended that Plaintiff obtain counseling at

Family Services. *Id*.

According to the record, Plaintiff was seen at Chemung County Mental Health

Clinic on May 5, 2005. (238-241)  At that time Plaintiff was employed, and was

complaining of depression, anxiety and poor sleep. (239)  Plaintiff also reported having

"problems with substance abuse," and indicated that her childrens' father was in jail.

(238)  Plaintiff denied any suicidal ideation. (239)  Plaintiff was diagnosed with

depressive disorder not otherwise specified. (241)

Approximately two years later, on March 29, 2007, Lori Seymour, MSW

("Seymour"), examined Plaintiff at the Chemung County Mental Health Clinic.  Plaintiff

complained  of depression, anxiety and mood swings. (227)  Plaintiff stated that she

had difficulty sleeping and experienced flashbacks, nightmares and suicidal ideation.

(232)  Seymour thought that Plaintiff's risk of suicide was "low." (235)  Seymour

observed that Plaintiff's appearance, behavior, thoughts, intelligence, insight, judgment,

attention span, memory, mood and affect were all normal. (230) Seymour's impression

was bipolar disorder, cocaine dependence, cannabis abuse and alcohol dependence.

(229)

On April 16, 2007, Susan Nitschke, NP ("Nitschke") conducted a psychiatric

evaluation.  Plaintiff reported that she had a long history of substance abuse and had

been diagnosed with depression by her family doctor. (221)  Plaintiff had previously

been prescribed Zoloft for depression by her family doctor, but had stopped taking that

medication seven months earlier. (222)  Plaintiff's drug of choice was crack cocaine, which at one point she was using on a daily basis. (221)  She also abused alcohol and marijuana. *Id*.  Plaintiff alluded to having mood swings. (222)  Nitschke placed Plaintiff on Depakote.

On May 21, 2007, Plaintiff told Nitschke that she had just spent a month in jail for a parole violation. (220)  Nitschke reported that Plaintiff was being purposefully vague about the reason she had been in jail. *Id*.  Plaintiff further told Nitschke that friends of hers had stolen and used her medications. *Id*.  Nitschke gave Plaintiff a short-term supply of medication samples, and indicated that she wanted to see whether Plaintiff had a clean toxicology screen before giving her more medication. *Id*. ("Her motivation for treatment is minimal and her abstinence is questionable.")  On June 4, 2007, Nitschke observed that Plaintiff was pleasant, cooperative and in good spirits. (219)  On July 9, 2007, Nitschke indicated that Plaintiff's diagnosis was bipolar disorder, cocaine dependence, cannabis abuse and alcohol abuse. (218)  Plaintiff was "well related and organized," and displayed "no severe evidence of depression." (218)

On July 16, 2007, Plaintiff was admitted to St. Joseph's Hospital in Elmira, NY, after she overdosed on multiple medications. (280-285)  She was released from the hospital on July 23, 2007.  Plaintiff indicated that she overdosed on an impulse, because she was angry, following a fight with her boyfriend in which she sustained a black eye. (294, 296)  Plaintiff stated that she had not used cocaine for a year, but her

urine tested positive for cocaine. (283-284)[2]  Joita Nedelcu, M.D. ("Nedelcu") reported

that in the hospital, Plaintiff initially was quite irritable and depressed, but her mood

gradually improved. (281)  Plaintiff indicated that she experienced anxiety attacks,

lasting up to 30 minutes, once per week. (283)  Plaintiff stated that although she was

taking Depakote for bipolar disorder, she had not experienced any manic or hypomanic

episodes. (281)  Nedelcu prescribed Vistaril for anxiety. (281)  Upon discharge, Plaintiff

was not depressed or irritable. (283)  Nedelcu's diagnosis was depressive disorder not

otherwise specified, intermittent explosive aggressive disorder, and substance abuse.

(280)

On August 7, 2007, Nitschke indicated that Plaintiff was not capable of working

in any capacity, due to bipolar disorder, alcohol dependence, cannabis dependence

and cocaine dependence. (311)  Nitschke stated that Plaintiff was moderately limited

with regard to remembering, understanding and carrying out instructions, maintaining

attention and concentration, making simple decisions, interacting appropriately with

others, maintaining socially appropriate behavior, and functioning at a consistent pace.

(312) Nitschke stated:  "At this time it is not recommended for Kelly to work.  She

needs to stabilize her mental health and addiction issues." (313)

On August 15, 2007, Saeed Uz-Zafar Khan, M.D. ("Khan") completed a

psychiatric evaluation, on behalf of the Mentally Ill Chemically Addicted  ("MICA")

Intensive Outpatient Program at Chemung County Family Services. (389-391)  Plaintiff

---

[2]As noted below, Plaintiff later admitted using cocaine as late as September 2008.  The medical record also refers to an unspecified "relapse" in or about April 2009, which resulted in Plaintiff's children being placed back in foster care. (383)

reported having "a lot of anxiety attacks," with inability to sleep and racing thoughts. (389)  Plaintiff stated that she had previously overdosed because her boyfriend was "very mean and aggressive towards her," and that she was currently worried that he was going to attack her. *Id*.  Khan reported that Plaintiff was slightly restless, with anxious and restricted affect. (390)  Plaintiff reported feeling helpless, scared and worthless. *Id*.  Khan's diagnoses were post-traumatic stress disorder, panic disorder without agoraphobia, bipolar disorder and polysubstance abuse. *Id*.

On November 9, 2007, Dennis Noia, Ph.D. ("Noia"), a non-treating examining agency psychologist, performed a psychiatric examination on behalf of the Commissioner. (314-318)  At that time Plaintiff was taking Lexapro and Tegretal. (315)  Plaintiff did not report having "any significant anxiety related symptoms, or symptoms of a formal thought disorder or cognitive dysfunction." (315)  However, Plaintiff reported having symptoms of depression and mania. *Id*.  Plaintiff stated that when she is depressed she experiences fatigue, crying spells, feelings of guilt, occasional thoughts of suicide without intent to actually commit suicide, and difficulty concentrating. *Id*. Noia reported that when Plaintiff is in a manic phase, she experiences inflated self-esteem/grandiosity, distractibility and excessive involvement in pleasurable activities. *Id*. Plaintiff stated that treatment had improved her symptoms, but not eliminated them. *Id*. Plaintiff indicated that she was able to care fore herself and her children, and perform chores including cleaning, laundry and shopping. (317)  Plaintiff further indicated that she spent her days doing chores, taking care of her children, going to her counseling sessions, watching television and listening to the radio. (317)  Upon examination, Noia

determined that Plaintiff's thought processes were coherent and goal directed with no evidence of disordered thinking, her mood was calm, her attention and concentration were intact, her memory was mildly impaired, and her cognitive functioning was in the low average range. (316)  Noia also found that her insight and judgment were fair. (317)  Noia observed that Plaintiff appeared to have difficulty dealing with stress. *Id*.  However, Noia stated that Plaintiff appeared capable of understanding and following simple instructions, performing simple tasks and some complex tasks, and "maintaining attention and concentration for tasks." (317)  Noia stated that Plaintiff seemed to be able to maintain a schedule, make appropriate decisions, and "interact moderately well with others." *Id*.  Noia's impression was bipolar disorder, not otherwise specified, and cocaine use, in full remission. *Id*.

On November 21, 2007, R. Altmansberger ("Altmansberger") completed a Psychiatric Review Technique form. (319-332).  Altmansberger's title or qualifications are not apparent from the report, although, at oral argument, counsel for both parties indicated that Altmansberger was an agency review physician.  Almansberger stated that Plaintiff suffered from affective disorders and substance addiction disorders, including bipolar disorder not otherwise specified, and cocaine use, in full remission. (319, 322, 327)  Almansberger stated that Plaintiff would have mild limitations in her activities of daily living, and moderate limitations with regard to maintaining concentration, persistence or pace and maintaining social functioning. (329)  Almansberger also completed a Mental RFC Assessment form. (333-336)  Almansberger reported that Plaintiff was moderately limited with regard to understanding, remembering and carrying out detailed instructions,  working a normal

workday and workweek without interruptions due to psychologically-based symptoms, accepting directions and criticism from supervisors and responding appropriately to changes in the work setting. (333-334)  Altmansberger stated that Plaintiff was not limited with regard to remembering, understanding and carrying out simple instructions, maintaining attention and concentration, sustaining an ordinary routine, working with others, interacting with the public, and maintaining socially-appropriate behavior. (333-334)  Overall, Altmansberger indicated that Plaintiff "retains the ability to perform simple, entry level work activities." (335)

On December 30, 2008, Carlos Delos-Reyes, M.D. ("Delos-Reyes") of Chemung County Family Services reported that Plaintiff appeared organized, cooperative, friendly, and showed no signs of depression. (388)  Plaintiff indicated that she felt anxious "occasionally." *Id*.

On February 5, 2009, Delos-Reyes completed a Mental Health Service Plan/Periodic Review form. (372)  Delos Reyes stated that his diagnoses were post-traumatic stress disorder, panic disorder without agoraphobia, bipolar disorder, ADHD and polysubstance dependence. *Id*.

On March 3, 2009, Delos-Reyes reported that Plaintiff was neat, organized and friendly, with appropriate affect and improved insight and judgment. (386)

On April 23, 2009, Delos-Reyes reported that Plaintiff's children had been placed in foster care, because she had apparently relapsed using drugs. (383)  He found no signs of depression, and that Plaintiff's insight and judgment were fair. *Id*.  Plaintiff complained that she did not feel Buspar was helping with her anxiety. *Id*.  Delos-Reyes

discontinued Buspar and prescribed Vistaril for anxiety. *Id*.

On May 21, 2009, Delos-Reyes reported that Plaintiff was alert and seemed to be in a good mood, with no sign of depression. (382)  Delos-Reyes stated that Plaintiff's mood was stable, with no mood swings, her affect was appropriate, and her memory was good. *Id*.  Delos-Reyes added that Plaintiff was excited about going back to school at Corning Community College to become a drug and alcohol counselor. *Id*.

On July 2, 2009, Delos-Reyes reported that Plaintiff was neat, organized, friendly, cooperative, coherent and relevant. (378)  Delos-Reyes saw no signs of depression. *Id*.  Plaintiff stated that she was sleeping well and not having any mood swings, though she did have occasional anxiety. *Id*.  Plaintiff stated that she had a history of ADHD, for which she had previously been prescribed medication from her family doctor, but that her family doctor had indicated that Plaintiff should receive such medication from Delos-Reyes. *Id*.  Delos-Reyes prescribed Strattera. *Id*.

On September 1, 2009, Delos-Reyes indicated that Plaintiff appeared "neat and well organized, with a brighter affect." (376)  Plaintiff reported that she was "doing very well with her medication," and that her concentration and sleep were improved. *Id*.  Delos-Reyes stated that there was "no sign of depression," and that Plaintiff's memory function was "good." *Id*.

On October 22, 2009, Delos-Reyes completed an RFC assessment, which he specifically stated was based on "client's self reports of previous vocational experiences." (345)  When asked whether Plaintiff's ability to understand, remember and carry out instructions was affected, Delos-Reyes stated "no." (344).  According to

the pre-printed instructions, if the answer was "no," which it was, Delos-Reyes was to proceed on to the next section of the questionnaire. (344)  Instead, Delos-Reyes completed the rest of the first section, and indicated that Plaintiff would have only "mild" limitations with regard to carrying out simple instructions, making simple work-related decisions, and understanding and remembering complex instructions. *Id*.  Delos-Reyes further stated that Plaintiff would have "moderate" limitations with regard to carrying out complex instructions, and "marked" limitations as to making judgments on complex work related decisions. *Id*.  When asked to explain the basis for those findings, Delos-Reyes wrote that Plaintiff's symptoms of mental illness, which he described as "ADHD and panic disorder," "may impact [her] ability to carry out complex instructions and to make judgments on such in the work environment." *Id*.  Delos-Reyes stated that Plaintiff would not have any limitations with respect to interacting with co-workers and supervisors. (345)  Delos-Reyes added that Plaintiff's organizational skills are "moderately affected" by ADHD. (345)  Notably, the form defined the term "mild" to mean that there was a "slight" limitation, but the patient could still "generally function well."  The form defined "moderate" to mean that the limitation was "more than slight," but the patient was still "able to function satisfactorily." The form defined the term "marked" to mean  a "serious limitation," with a resulting "substantial loss in the ability to function." (344)  With those definitions in mind, Delos-Reyes indicated that Plaintiff could function either well or satisfactorily in all areas, except with regard to "complex" work-related matters. *Id*. Delos-Reyes cautioned, though, that Plaintiff's "sustained work efforts" might be severely affected by symptoms of panic disorder. (345)

14

Approximately one month later, on November 20, 2009, Delos-Reyes completed another report, using a different form. (349-351)  This time, the questionnaire was concerned with four areas:  1) concentration and persistence; 2) interaction with others; 3) adaptation/stress; and 4) the number of days that Plaintiff would likely miss from work per month.  As to the terms mild, moderate and marked, the form used essentially the same definitions set forth above.  Delos-Reyes stated that Plaintiff was "moderately" limited with regard to performing activities on time, sustaining a routine without supervision, completing a normal workday and workweek without substantial interruptions from psychologically-based symptoms, interacting with the public, accepting direction from supervisors, and getting along with co-workers. (349-350)  According to the definitions, therefore, Delos-Reyes indicated that Plaintiff could function "satisfactorily" in those areas, despite having some limitations.  Delos-Reyes stated, though, that Plaintiff had "marked" limitations in three areas: 1) maintaining attention and concentration for long periods, which he attributed to "ADHD"; 2) responding appropriately to ordinary work stress; and 3) responding to changes in the work setting. (349-350)  According to the definitions used therein, Delos-Reyes indicated that Plaintiff had a substantial loss in her ability to function in those three areas.  Delos-Reyes further stated that Plaintiff would reasonably be expected to miss "more than 3" days of work per month, due to her mental symptoms. (350)  Although Delos-Reyes was asked to state the diagnosis upon which his answers were based, as well as any symptoms that he observed, he left that section blank. (350)   Lastly, Delos-Reyes indicated that Plaintiff was taking Celexa, Trazodone, Abilify, Vistaril and Straterra, but did not have any side-effects from those medications. (350)

15

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the

Commissioner of Social security as to any fact, if supported by substantial evidence,

shall be conclusive."  The issue to be determined by this Court is whether the

Commissioner's conclusions "are supported by substantial evidence in the record as a

whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a
> claimant meets this definition.  First, the SSA considers whether the claimant is
> currently engaged in substantial gainful employment.  If not, then the SSA
> considers whether the claimant has a "severe impairment" that significantly limits
> the "ability to do basic work activities.  If the claimant does suffer such an
> impairment, then the SSA determines whether this impairment is one of those
> listed in Appendix 1 of the regulations.  If the claimant's impairment is one of
> those listed, the SSA will presume the claimant to be disabled.  If the impairment
> is not so listed, then the SSA must determine whether the claimant possesses
> the "residual functional capacity" to perform his or her past relevant work.
> Finally, if the claimant is unable to perform his or her past relevant work, then the
> burden shifts to the SSA to prove that the claimant is capable of performing "any
> other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE")](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[3] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d)[4]; see also, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) ("If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional impairments significantly limit the range of work permitted by his exertional limitations then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.") (citation and internal quotation marks omitted).  More specifically,

---

[3]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 416.969a(a). "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a(c).

[4]20 C.F.R. § 416.969(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

> where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate.  A claimant's work capacity is "significantly diminished" if there is an additional loss of work capacity that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.

*Pratts v. Chater*, 94 F.3d at 39 (citations and internal quotation marks omitted).  Put another way, a claimant's work capacity is "significantly diminished" if the nonexertional impairments cause "the additional loss of work capacity *beyond a negligible one*." *Bapp v. Bowen*, 802 F.3d at 606 (emphasis added).  The term "negligible" is defined as "so insignificant as to be unworthy of consideration." Webster's II New College Dictionary (Houghton Mifflin Co. 1995).

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . .  that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).  Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature

and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
                                        ***
In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other

evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

> Factors relevant to your symptoms, such as pain, which we will consider
> include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other
> symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication
> you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for
> relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other
> symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes
> every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions
> due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

THE ALJ'S DECISION

On March 2, 2010, the ALJ issued the decision that is the subject of this action.

(11-21).   At the first step of the five-step sequential analysis described above, the ALJ

found that Plaintiff has not engaged in substantial gainful employment since August 27,

2007, the date that she applied for SSI benefits. (13)

At the second step of the analysis, the ALJ found that Plaintiff has the following

severe impairments: "bipolar disorder, and polysubstance abuse." (13).   On the other

hand, the ALJ found that Plaintiff's claimed attention deficit disorder ("ADD") was not

severe, because she was never diagnosed with such a condition by an acceptable

medical source. (14)[5] The ALJ further noted that Noia reported that Plaintiff's attention

and concentration were intact, and Delos-Reyes described Plaintiff as "organized." *Id*.

At step three of the five-step analysis, the ALJ found that Plaintiff does not have

a listed impairment or combination of impairments that meets or equals a listed

impairment. (14).  On this point, in considering the "paragraph B" criteria[6] for mental

impairments, the ALJ found:  "[T]he claimant has no restrictions on her activities of daily

living, mild limitations on her social functioning, moderate limitations on her

concentration, persistence, or pace[7], and no episodes of decompensation." (15)

(emphasis added).

At step four of the five-step analysis, the ALJ determined Plaintiff's RFC as

follows: "[C]laimant has the residual functional capacity to perform a full range of work

---

[5]Dr. Delos-Reyes referred to Plaintiff as having ADHD, apparently based on Plaintiff's self-report of having the condition, and he also prescribed her Strattera for ADHD.  However, Plaintiff's motion  does not specifically challenge the finding by the ALJ that Plaintiff's ADHD was not a serious impairment.

[6]"Section 12 of the Appendix sets forth the criteria for determining whether an individual's mental impairment is severe enough to preclude all work. *See* 20 C.F.R. § 416.925; 20 C.F.R. § 404, subpt. P., app. 1, § 12. For each listed disorder, there are "paragraph A" criteria, which set forth the disorder's specific medical characteristics, and "paragraph B" criteria, which set forth the functional limitations that the impairment must cause in order for the individual to be considered per se disabled. *See* 20 C.F.R. § 404, subpt. P., app. 1, § 12(A). For some disorders, there are also "paragraph C" criteria, which are to be considered in the alternative if the paragraph B criteria are not satisfied. *See id* . An individual will be found disabled if his impairment fulfills the requirements set forth in paragraph A, and the requirements of either paragraph B or C, for the disorder in question. (*See id.*)"  *Smith-Siegel v. Astrue*,  No. 09 Civ. 0613(JGK)(THK), 2010 WL 2834888 at *14 (S.D.N.Y. Jun. 23, 2010), report and recommendation adopted by 2010 WL 2834876 (S.D.N.Y. Jul. 19, 2010).

[7]Later in the same paragraph the ALJ states: "In terms of concentration, persistence or pace, *while the evidence or record does not reflect any difficulties in this area*, the claimant testified that she has problems with remembering what she reads." *Id*. (emphasis added).  At oral argument, the Court indicated that this statement seemed to contradict the ALJ's earlier statement that Plaintiff had moderate difficulties with concentration persistence or pace.  That is because, from the way in which the sentence is worded, it at first seemed that the ALJ was saying that the record did not reflect "any difficulties in this area," meaning the area of concentration, persistence or pace.  Upon re-reading this passage, it seems that the "area" to which the ALJ was referring was Plaintiff's ability to remember what she reads.  Accordingly, the Court now understands the ALJ to be stating that Plaintiff has moderate limitations with regard to concentration, persistence and pace generally, but no difficulty with understanding what she reads.

at all exertional levels.  She also has the abilities (on a sustained basis) to understand, carry out, and remember simple instructions, to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting." (15)  In this regard, the ALJ found, and it seems undisputed, that Plaintiff has no exertional limitations.

As for nonexertional limitations, the ALJ reviewed Plaintiff's statements concerning such limitations, and found them only partially credible.  On this point, the ALJ noted that Plaintiff claimed, due to periods of depression, to be unable to care for her children, to be around people, and to concentrate. (16)  However, the ALJ found that Plaintiff's reported activities of daily living, including her ability to take college classes, indicated that she was less impaired than she claimed. *Id*.   The ALJ further stated that Plaintiff's statements were not supported by the medical evidence. Specifically, the ALJ observed that Plaintiff had a history of noncompliance with treatment, and that her mental status examinations were generally normal.  (16-17)

The ALJ also discussed the medical opinion evidence from Nitschke, Noia, Altmansberger and Delos-Reyes. (17-19)  Although Nitschke opined that Plaintiff was completely unable to work, the ALJ gave only "partial evidentiary weight" to that opinion, to the extent that it did "not preclude the demands of basic mental work activities." (19) The ALJ declined to give greater weight to Nitschke's opinion, because it focused "significantly on the claimant's drug and alcohol use," which, if found to be "a contributing factor material" to a disability determination, would result in the denial of benefits. See, 42 U.S.C. § 1382c(a)(3)(J).   The ALJ gave "some weight" to Noia's opinion generally, but little weight to that portion of Noia's opinion which indicated that

Plaintiff would have difficulty handling stress. (18)  The ALJ gave "some weight" to

Altmansberger's opinion.  The ALJ gave "partial weight" to Delos-Reyes' opinion from

October 2009, to the extent that she agreed that Plaintiff could not perform complex

work. (19)  The ALJ gave only "limited weight" to Delos-Reyes' opinion from November

2009, since it was inconsistent with his treatment notes and his report issued a month

earlier. *Id*.  Finally, at step four, the ALJ found that Plaintiff has no past relevant work.

At step five of the sequential analysis, the ALJ used the Grids as a framework to

find that Plaintiff was not disabled, without taking testimony from a VE. (20)  Essentially,

the ALJ found that Plaintiff was not disabled because her nonexertional impairments do

not prevent her from doing unskilled work:

> Social Security Ruling 85-15 provides, in pertinent part, that so long as an
> individual can perform the basic mental demands of competitive,
> remunerative, unskilled work, the individual  may be found to be 'not
> disabled.'  The SSR further provides that such basic mental demands
> include the abilities to understand, carry out and remember simple
> instructions; respond appropriately to supervision, coworkers and usual
> work situations; and deal with changes in a routine work setting.  The
> undersigned finds that the evidence establishes that the claimant has no
> significant limitations in the performance of these basic mental demands
> of work.

(20)

## ANALYSIS

Plaintiff maintains that the ALJ erroneously failed to include the findings that she

made at step 3 of the sequential analysis in the RFC finding.  As discussed above, at

step 3 the ALJ found, *inter alia*, that Plaintiff has moderate limitations on her

concentration, persistence, or pace.  However, the ALJ did not include that finding in

her RFC determination at step 4.  In that regard, the ALJ seems to indicate that she

was not required to do so, since the findings at step 3 "are not a residual functional

capacity assessment." (15) (citing SSR 96-8p)  On the other hand, the ALJ may have

factored in any such limitations by finding that Plaintiff was limited to performing only

simple, unskilled work. (18, 20)

The Court agrees that the findings at Step 3 are not an RFC determination.

Pursuant to SSR 96-8p, "the limitations identified in the 'paragraph B' and 'paragraph C'

criteria are not an RFC assessment but are used to rate the severity of mental

impairment(s) at steps 2 and 3 of the sequential evaluation process." *Id*., 1996 WL

374184 at *4 (S.S.A. Jul. 2, 1996).  However, SSR 96-8p further states that

> [t]he mental RFC assessment used at steps 4 and 5 of the sequential
> evaluation process *requires a more detailed assessment by itemizing
> various functions* contained in the broad categories found in paragraphs B
> and C of the adult mental disorders listings in 12.00 of the Listing of
> Impairments, and summarized on the PRTF [Psychiatric Review
> Technique Form].

*Id*.  Here, the ALJ's discussion of Plaintiff's mental functions at steps 4 and 5 was less

detailed than at step 3.

Moreover, when making findings about a claimant's RFC, an ALJ may not avoid

conducting such a detailed assessment by merely indicating that the claimant can

perform simple, unskilled work. *See, e.g., Hudson v. Commissioner of Social Sec.*, Civil

Action No. 5:10–CV–300, 2011 WL 5983342 at *9-10 (D.Vt. Nov. 2, 2011) (Holding that

ALJ erred in posing hypothetical to VE when, rather than indicating that claimant had

specific limitations with regard to concentration, persistence or pace, the ALJ merely

indicated that the claimant could perform "routine and repetitive tasks with brief and

superficial contact with the general public, coworkers, and supervisors.") (citing *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) and *Winschel v. Commissioner of Social Sec.*, 631 F.3d 1176, 1180-1181 (11th Cir. 2011)).  If, as the *Stewart* and *Winschel* cases hold, the ALJ must specifically include the claimant's limitations with regard to concentration, persistence and pace when formulating a hypothetical to a VE, it stands to reason that the ALJ must consider those limitations when making a determination at step 5 without the assistance of a VE.[8]  *See*, SSR 85-15, 1985 WL 56857 at * 4, 6 (S.S.A. 1985) ("The decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with the capacity to do at least unskilled work.  This decision requires careful consideration of the assessment of RFC. . . .  Any impairment-related limitations created by an individual's  response to demands of work . . . must be reflected in the RFC assessment.").

It is unclear in this case whether the ALJ gave any consideration to the limitations she identified at step 3 when she was making her RFC determination. *See*, ALJ Decision (20) (Purportedly finding an "absence of any nonexertional limitations involving unskilled work," despite having previously found at Step 3 that Plaintiff had moderate limitations with regard to concentration, persistence and pace) (emphasis added).  It is also unclear whether the ALJ may have attempted to factor in those limitations by finding that they did not affect Plaintiff's ability to perform simple unskilled work.  In either case, the ALJ erred by failing to discuss Plaintiff's specific nonexertional

---

[8]This Court has previously remanded an action to the Commissioner for failure to call a VE when the claimant had moderate nonexertional impairments. *See, Lugo v. Astrue*, 11-CV-6028 CJS, Decision and Order dated March 30, 2012.

mental impairments as part of the RFC determination.

Plaintiff further contends that the ALJ erred in evaluating the medical evidence. The Court agrees.  In that regard, the ALJ generally summarized the opinions of Delos-Reyes, Nitschke, Noia and Altmansberger, and indicated that she was giving each of them some weight.  The ALJ specifically indicated that she disagreed with Noia's and Delos-Reyes' assessments that Plaintiff would have difficulty handling stress. (18-19) The ALJ also stated that she disagreed with certain other aspects of Delos-Reyes' opinions. (19)  Otherwise, though, the ALJ merely indicated that she was accepting the medical evidence to the extent that it supported a finding that Plaintiff could perform simple unskilled work. *See, e.g.*, ALJ's Decision (19) (Indicating that she was giving partial weight to Delos-Reyes' October 2009 opinion, to the extent that "his opinion does not preclude the demands of basic mental work activities.")   The ALJ is required to indicate the weight that she is giving to the medical opinion evidence in terms of specific functional limitations, before indicating what type of work the claimant can perform. *See*, SSR 96-8p, 1996 WL 374184 at *1 (S.S.A. Jul. 2, 1996) ("The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 CFR 404.1545 and 416.945."); *see also, id.* at *3 ("[I]n order for an individual to do a full range of work at a given exertional level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level.  Therefore, it is necessary to assess the individual's capacity to perform each of these functions in

order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level."). Here, the ALJ did not identify specific functional limitations as part of the RFC finding.

Plaintiff also objects to the ALJ's decision to disregard the medical evidence concerning Plaintiff's alleged inability to handle stress. On this issue, the ALJ stated: "[T]he claimant is able to manage stressful activities, such as going to jail, going to court, gaining custody of her children, and attending college without decompensating.") (19) The Court agrees that this finding is not supported by substantial evidence.

Plaintiff further contends that the ALJ erred in evaluating her credibility, based upon the ALJ's misrepresentation of the record. Pl. Memo of Law [#10-1] at p. 14. Plaintiff disputes the ALJ's finding that Plaintiff's claimed limitations are belied by her activities of daily living and the medical record. As to this point, Plaintiff alleges that the ALJ ignored evidence that was favorable to Plaintiff and "cherry-picked" information from the medical records. *Id*. at pp. 14-18. More specifically, Plaintiff maintains that the ALJ failed to consider the evidence indicating that Plaintiff was only able to function well when she was not experiencing depression. *See, id*. at p. 14 (Arguing that the ALJ's credibility determination "is completely one sided and does not take into account any evidence favorable to the plaintiff and misrepresents part of the functioning fo the plaintiff.") However, the ALJ specifically discussed Plaintiff's contentions regarding the effects of her depression on her ability to function. *See*, 16, second full paragraph. Moreover, as the ALJ noted, Plaintiff apparently told Noia that she was able to take care of all normal activities of daily living, for both herself and her children. (317) Plaintiff also indicated that she was attending college.

Plaintiff nevertheless contends that the ALJ unfairly found that her credibility was undermined by the medical records, which, according to the ALJ showed that Plaintiff was often non-compliant with treatment, and that her mental status examinations were generally normal.  In fact, though, the medical records do show that Plaintiff's mental status was generally normal.  On the few occasions when it was not, and particularly during the episode in July 2007 when Plaintiff overdosed, Plaintiff's agitated or distressed mental status seems to have been a direct result of fights with her boyfriend and/or drug usage and resulting legal problems.

As for Plaintiff's alleged non-compliance with treatment, the record does contain numerous office notes indicating that Plaintiff failed to appear for appointments. *See, e.g.*, 218 (Plaintiff missed 3 weeks of treatment in June-July 2007 because she was watching her sister's children); 384-385,379-381, 377,374-375 (no-shows on April 2, 2009, April 16, 2009, June 18, 2009, June 23, 2009, June 30, 2009, July 30, 2009, September 29, 2009 and November 5, 2009).  Plaintiff also apparently did not receive treatment between May 5, 2005 and March 29, 2007, or during most of 2008[9], since there are no treatment records for those periods.  One medical note, dated April 16, 2007, specifically indicates that Plaintiff "has a history of non-compliance with treatment" (221), although the writer may have been referring to the gap in treatment between 2005 and 2007, and Plaintiff's failure to complete a rehab program in 2005 (244).  On the other hand, on December 30, 2008, Delos-Reyes reported that Plaintiff "remains compliant with medication." (388)  However, overall, it appears that the ALJ's

---

[9]Plaintiff was still using drugs in 2008. *See*, Hearing Transcript (30) (Plaintiff testified that she stopped using cocaine on September 30, 2008)

statement concerning Plaintiff's non-compliance with treatment is supported by substantial evidence insofar as it pertains to Plaintiff's failure to appear for appointments, although it is unclear whether Plaintiff was also non-compliant with regard to taking her medication.  (On this point, the Court observes that Plaintiff's mental symptoms seem to be well-controlled when she takes her medication, which she almost usually does unless she runs out.)  It is also unclear why Plaintiff missed so many appointments, since she was not asked about this at the hearing.  On remand, Plaintiff should be given an opportunity to explain her missed appointments.

CONCLUSION

For the reasons set forth above, Plaintiff's motion for judgment on the pleadings [#10] is granted, Defendant's cross-motion for judgment on the pleadings [#12] is denied, and this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order, pursuant to 42 U.S.C. § 405(g), sentence four.  The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
        May 30, 2012

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge